## LEE HILL *v.* THE STATE.

1. THEFT — INDICTMENT — ALLEGATION OF OWNERSHIP.— If one person has the ownership of the property and another has the possession, charge, or control of it, the ownership may be alleged in either.

2. EVIDENCE— CONFESSIONS.— In a trial for the theft of a horse the only evidence inculpatory of the accused was a confession imputed to him by the prosecuting witness, who, being the half-brother of the accused, justified his unnatural attitude by a desire to separate the accused from evil associates. The testimony of this witness was contradictory in various particulars of his own deposition at the examining trial, and material statements which he ascribed to the accused were inconsistent with the evidence of other witnesses. Aside from the putative confession, the only proof of the *corpus delicti* was the fact that the animal was missed from a certain field; and, on the other hand, there was proof that it was repeatedly seen on its accustomed range soon after its disappearance from the field. *Held,* that evidence proved neither the *corpus delicti* nor the culpability of the accused. Note the comments made upon it in the opinion.

APPEAL from the District Court of Gonzales. Tried below before the Hon. EVERETT LEWIS.

The indictment charged the appellant with the theft of a horse, the property of Fannie Kellman, from her possession, on March 1, 1881. Being found guilty by the jury, they assessed his punishment at a term of five years in the penitentiary.

Mrs. Fannie Kellman, the alleged owner of the animal, was the first witness examined by the prosecution. It appears by her testimony that she was the wife of Phillip J. Kellman, and that, on some undisclosed accusation, he was committed to jail about three months before the alleged theft. Previous to his arrest he estrayed the horse in question, and when he was put in jail he "turned over to" the control and management of the witness the same animal. She was absent from home at the time, and requested her father, W. S. McAda, to look after the horse for her.

R. R. Jewell, the principal witness for the State, testified that he was twenty-seven years old, and was a half-brother of the appellant, who was not quite twenty-one. The parents of the appellant were dead, and he was brought to Gonzales county by the witness, about three years before the trial. About two weeks after Mrs. Kellman's pony was stolen, the appellant came to where the witness was herding sheep, near Sid Billings's, and, after some desultory conversation, he remarked that Fannie Kellman had lost her pony; to which the witness replied that he supposed the Mexicans had taken it. Appellant smiled and said "No," and the witness then asked him if he knew anything about the pony, and he replied that the Mexicans didn't get it. He then said that he had got the pony; that after old man Kennedy (with whom appellant seems then to have lived) had gone to bed and got quiet, he (the appellant) got up and went into W. S.

McAda's field and caught the pony, and took it to a thicket on Long Hollow, and tied it in the thicket until Jim Pearce Wright's herd came along, next morning, and then he turned the pony loose in the said herd and . Wright took it west; and that he, the appellant, had received from Wright a good saddle in return for the pony. This confession, the witness said, was made to him voluntarily by the appellant, and without threat or inducement. There was no other person present.

On the cross-examination the witness denied that he had tried to get the appellant to leave the country because he, the witness, had forged a bill of sale to an estray and had asked appellant to witness it,— which the latter refused to do. Witness said he tried to get appellant to leave the country, to get him away from the company of bad men who were leading him into trouble; that he also tried to get the appellant a situation with Dock Burnett, to drive cattle to Kansas, but had never tried to get him to leave for fear he would testify against witness about a forgery. Witness denied forging any bill of sale, and said he knew nothing about such a forgery. The reason that he prosecuted the appellant for stealing this horse was to get him out of and away from this country on account of his association.

In the further course of the cross-examination the witness denied that he had testified at the examining trial that the appellant, in conversation about the horse, did not state where he had turned the horse loose or where it went when it was turned loose; and the witness also denied that on the same occasion he testified that the appellant did not state whether it was night or day when he hemmed the horse in the field; and denied further that he stated at the examining trial that the appellant got excited when he was asked by the witness whether he, the appellant, took Fannie Kellman's horse. The record of the examining court contradicted these denials of the

witness; with regard to one of which, however, he explained that the appellant told him he got the horse after they had gone to bed at old man Kennedy's, and after they had gotten quiet, and that he, witness, concluded it was at night. The testimony of the witness at the examining trial, as shown by the record put in evidence by the defense, concluded as follows: "R. R. Jewell, recalled for the State. In answer to question 'What did defendant tell you in the conversation about getting a horse for the one hemmed up in McAda's field?' witness says defendant said he got a good one."

R. J. Kennedy, Sr., for the defense, testified that the appellant slept at witness's house the night the horse was stolen, and witness saw him go to bed about eight or nine o'clock that night, and saw him again between four and five o'clock the next morning, but not between those times. Witness remarked to him, "Lee, you are turning in early to-night." Jim Pearce Wright penned his herd of cattle at witness's house that night. ` Appellant helped Wright off with his cattle the next morning, but did not go further than around in sight of the house,— about 300 yards. Appellant came back and witness sent him off after a horse, and saw no more of him until dinner. He started south after the horse, and kept that course as far as witness could see him, whereas Wright's herd went nearly west. From witness's house to McAda's the distance is about half a mile, and to the nearest point of McAda's field it is 600 yards. Between witness's field and McAda's there was nothing but a cross fence. It is a mile from witness's house to the nearest point on Long Hollow, and a mile and a quarter to where Wright's herd crossed Long Hollow.

G. B. Kennedy's testimony at the examining court in behalf of the defense was put in evidence. According to it the witness, the appellant, and several others stayed out at Wright's camp until eight or nine o'clock of the night in

question, and about that time of night the witness and the appellant went into old man Kennedy's house, and the appellant undressed and went to bed in the room where the witness slept. It commenced to rain, and witness, who had a mare roped up, told the appellant to get up and go with him into the field, to turn the mare loose. Appellant asked Charley Kennedy to go with witness in his place, and when witness and Charley came back, in about twenty minutes, the appellant was in bed and seemed to be asleep, and was there when the witness got up the next morning. Appellant and the witness helped Wright make a start with his herd, and then returned. Appellant had no chance to handle a horse during that day.

It was an agreed fact that the horse in question ranged in the fork of the Guadalupe and the San Marcos rivers before he was estrayed by Kellman.

B. M. Lemmond, for the defense, testified that about the day laid in the indictment he saw, some half a dozen times, a bay pacing pony about eight miles north of McAda's field, and on a line from it to the forks of the Guadalupe and San Marcos rivers. It was an estray in that neighborhood. The witness delineated the brand which was on the animal.

The defense showed by the record of estrays that the animal estrayed by McAda was a bay pony horse, and bore the same brand as that delineated by Lemmond.

After verdict the defense filed a motion for a new trial, which was overruled, and exception was reserved.

*Fly & Davidson,* for the appellant, filed an able brief and argument.

*H. Chilton,* Assistant Attorney General, for the State.

Hurt, J. Philip Kelman estrayed the animal charged to have been stolen some time in 1880. He was arrested

and placed in jail on the 1st December, 1880, and has remained therein ever since. When arrested "he (to use the language of Mrs. Kelman) turned the horse over to my control and management by express agreement." Mrs. Kelman left her home for a short visit, asking her father "to look after the horse for her."

The indictment charged that the horse belonged to Mrs. Kelman. The defendant objects that there is a failure of proof on this allegation: 1st. That, from the evidence, Mrs. Kelman is not the owner of the horse; and 2d. The property should have been laid in Philip Kelman, and not in Mrs. Kelman. To this we cannot agree; for if one person owns the property and another has the possession, charge, or control of the same, the ownership may be alleged in either. Art. 426, Code Crim. Proc.

The controlling question in this case is the sufficiency of the evidence to sustain the conviction. (The reporters will give the evidence.) The only witness whose evidence tends to connect the witness with the offense, if an offense was committed, is one R. R. Jewell, a half-brother of defendant. It seems that defendant is about twenty-one years of age, without father or mother, and that he has been under the fostering care and control of his half-brother, the witness. This half-brother swears that, "about two weeks after Fannie Kelman's pony was taken, defendant came to where I was herding sheep, near Sid Billings's, and after some desultory conversation defendant remarked "that Fannie Kelman had lost her pony. I replied yes, I suppose the Mexicans have taken it. He smiled and said no. I then asked him if he knew anything about it, and he said the Mexicans did not get it. He then said or told me that he got the pony; that after old man Kennedy's family had gone to bed and got quiet he got up and went into W. S. McAda's field and hemmed up the horse, and caught him and took him to a thicket on Long Hollow, and tied him in the thicket until

Jim Pearce Wright's herd came along next morning, and he then turned the horse loose in said herd, and Wright took him west; and defendant received from Wright a good saddle in return for the pony.  The confession was voluntarily made to me by defendant, without inducement or threat on my part.  Bascom McAda had given Brazzel Kennedy authority to get this pony out west, and had given him the brand to look for.  There was nobody present when defendant and myself had this conversation.  Defendant's counsel asked witness if he did not try to get defendant to leave the country because witness had forged a bill of sale to an estray horse, and wished defendant to witness it for him and defendant refused.  Witness answered he did not, but tried to get the defendant to leave the company of bad men who were leading him into trouble; also tried to get defendant a situation with Dock Burnett to drive cattle to Kansas, and did not try to get him to leave for fear he would testify against him about said forgery.  Witness said he did not forge the bill of sale, and knew nothing about it; also testified that the reason he, witness, prosecuted defendant for stealing this horse was to get him, defendant, out of and away from this country on account of his association," etc.

From the sworn testimony of this witness, his object was not to get defendant out of the country to prevent him from proving the forgery, but, prompted by the loving regard of a kind relative, he desired to snatch him from his depraved and villainous associates.  These must have been of the basest sort, indeed, for he verily believed that the inmates of the penitentiary would be an improvement, with whom it was his loving desire to place his half-brother.  To this he directly swears.  This may be true, but we will not believe it, nevertheless.  The eternal law of our nature revolts at such a proposition. His half-brother's associates were very bad; to reclaim

him he sent him to the penitentiary. How a sensible jury could have given credence to this witness we cannot understand. This court will never consent to a verdict and judgment the result of which is the incarceration and infamy of a citizen upon the evidence of such a kind and considerate brother, unless corroborated by cogent facts. Is he corroborated? Not in the slightest degree. He is not only uncorroborated, but self-contradicted in a number of facts, as shown by his evidence before the committing court,— contradicted and impeached by his own record.

On the other hand, when we look to the evidence of the other witnesses, the guilt of the defendant is rendered very improbable. The horse was taken from McAda's field near old man Kennedy's, if taken at all. By the old man and his son defendant was seen to have gone to bed that night at Kennedy's, and was seen as late as eleven o'clock at night, and between four and five o'clock next morning. This was the night the horse was said to have been taken. G. B. Kennedy testified to the fact that he helped Jim Pearce Wright drive his cattle out near Chandler's and then turned back; defendant had no chance to handle the horse during the day. Before being estrayed, the horse's range was in the forks of the Guadalupe and San Marcos rivers. He was missing on the 14th of February, and was seen by the witness Lemmond in March, a half dozen times, about eight miles north and between McAda's and the forks of the above named rivers. There is no evidence that the horse was taken by any person, save the fact of his being missing. Mrs. Kelman was not at home when this occurred. Old McAda was inquiring after the horse next morning. These facts show evidently that, if taken by any person, these witnesses knew nothing of the fact further than that he was not in the field. To convict on the confessions of a defendant the *corpus delicti* must be shown *aliunde*. It cannot be done by

confessions. There was no attempt by the State to prove the *corpus delicti*. McAda was not introduced as a witness at all. But, concede the *corpus delicti*, there being no evidence tending to connect defendant with the theft, save that of R. R. Jewell, and his coming in such a questionable shape, being uncorroborated, conflicting, contradictory and stultifying, we are not willing that this judgment should stand.

The judgment is reversed and the cause remanded for a new trial.

*Reversed and remanded.*